**AFFIRM; and Opinion Filed August 18, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00418-CR
### No. 05-14-00419-CR

**DIANA FLORES PEINADO, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court No. 5**
**Dallas County, Texas**
**Trial Court Cause Nos. F-10-25782-L & F-12-00406-L**

## MEMORANDUM OPINION
Before Justices Fillmore, Myers, and Evans
Opinion by Justice Fillmore

In trial court Cause Number F-10-25782-L (appeal number 05-14-00418-CR), a jury convicted appellant Diana Flores Peinado (Diana)[1] of interference with child custody and assessed punishment of two years' confinement. In trial court Cause Number F-12-00406-L (appeal number 05-14-00419-CR), the jury convicted Diana of kidnapping and assessed punishment of six years' confinement.

In seven points of error, Diana contends: (1) the trial court erred by refusing her request for a mistake-of-fact jury charge instruction in both cases; (2) the trial court abused its discretion in both cases by overruling her objection to evidence of extraneous offenses; (3) the evidence is

---

[1] In this opinion, we refer to minor children by their initials. Because appellant and a minor child have the same initials and various witnesses have the same surname, we refer to the defendant and those witnesses by their first names.

insufficient to support her conviction of kidnapping; (4) the evidence is insufficient to support her conviction of interference with child custody; (5) the trial court erred in both cases by excluding testimony of a defense witness in the punishment phase of trial; (6) the trial court erred in both cases by limiting testimony of a defense witness in the punishment phase of trial; and (7) there was jury charge error in the kidnapping case because the application paragraph failed to require the jury to find the element of intent to prevent liberation and failed to require a unanimous verdict. We affirm the trial court's judgments.

## Background

### *Indictment*

Diana was charged with interference with child custody, *see* TEX. PENAL CODE ANN. § 25.03(a) (West Supp. 2014) and aggravated kidnapping, TEX. PENAL CODE ANN. § 20.04(b) (West 2011). These cases were tried before a jury.

### *Evidence at Trial*

The reporter's record includes the testimony of numerous witnesses at trial, as well as voluminous documents admitted in evidence. Because this appeal involves a challenge to the sufficiency of the evidence to support Diana's convictions, a discussion of the testimony and key exhibits admitted at trial is necessary.

### Jose Andrade

Jose Leonel Andrade (Andrade) is Diana's ex-husband and father of their child, L.A. Andrade testified that following Diana and Andrade's separation, Diana married Jose Gabriel Peinado (Jose). In addition to L.A., Diana has four other children: Kimberly Jimenez (Kimberly), Victor Jimenez (Victor), S.J., and D.P.

Diana and Andrade's marriage was dissolved, and issues relating to custody of L.A. were addressed, in 2005 by a family court in Bexar County, Texas, where Diana and Andrade then

resided. The trial court's final divorce decree ordered that Andrade and Diana had standard visitation and joint custody of L.A. Andrade testified he has never been found to have violated a child custody order of the family court. However, according to Andrade, there were times Diana did not allow Andrade visitation of L.A. in violation of provisions of the final divorce decree, and Diana had been found to have violated orders concerning child custody on multiple occasions. A July 14, 2008 order of the 131st Judicial District Court of Bexar County, awarding Andrade exclusive possession of L.A., was admitted in evidence. Andrade testified that the order specifically referred to Diana failing to allow Andrade to exercise visitation with L.A. and forcefully taking L.A. from Andrade when he was exercising his visitation rights. In pertinent part, the July 14, 2008 "Order Revoking Suspension and for Commitment to County Jail" provides:

> On July 14, 2008 the Court heard the compliance hearing on Movant's Motion to Revoke Suspension of Commitment.
>
> * * *
>
> Respondent, [Diana], appeared in person and, having waived the right to counsel, announced ready for trial.
>
> * * *
>
> Findings
>
> The Court finds that [Diana] has failed to comply with the terms and conditions of the order of this court suspending commitment signed on January 13, 2005, which appears of record in the minutes of this Court . . . and states in relevant part as follows:
>
>> *"Findings*
>>   *The Court finds that [Diana] is guilty of separate violations of the order signed March 17, 2005 in Cause No. 2004-CI-14796, styled "In the Matter of the Marriage of JOSE LEONEL ANDRADE and DIANA LAURA FLORES and in the Interest of [L.A]., a Child," in the 224th Judicial District Court of Bexar County . . . .*
>
> * * *

*The Court further finds that [Diana] has failed to comply with and has violated the provisions of the order as follows:*

    *Violation 1:   On December 4, 2005, [Diana] failed to present child at Kids Exchange for court order [sic] visitation.*

    *Violation 2:   December 17, 2005, [Diana] failed to present child at Kids Exchange for court order [sic] visitation.*

*The Court specifically finds that [Diana] is in contempt for each separate violation enumerated above.*

\* \* \*

*Relief Granted*

    *IT IS ADJUDGED that [Diana] is in contempt for each separate violation enumerated above.*

\* \* \*

The Court further finds that [Diana] failed to comply with the terms of the suspension of commitment as follows:

1.    [Diana] failed to comply with the Court's order regarding summer visitation in that on June 29, 2008, she forcefully took the child from [Andrade] while he was exercising his 42 day summer possession period. . . .

2.    [Diana] has failed to pay attorney's fees as ordered. . . .

\* \* \*

Relief Granted

Revocation

    IT IS ADJUDGED that [Diana] has failed to comply with the terms and conditions of suspension of commitment as enumerated above. IT IS ORDERED that suspension of commitment of [Diana] is revoked.

\* \* \*

Commitment

    IT IS ORDERED THAT [Diana] is committed to the custody of the sheriff of Bexar County, Texas, to be confined, as ordered by the order suspending commitment for a period of six months.

\* \* \*

Additional Periods of Possession and Suspension of Child Support

IT IS FURTHER ORDERED that [Andrade] shall have the exclusive possession of the child until further order of this Court. . . .

Andrade moved to Garland, Dallas County, Texas in 2007 or 2008, and L.A. came to live with him approximately five months later. A September 12, 2008 order of the 131st Judicial District Court was admitted in evidence. The September 12, 2008 order, issued after a hearing at which Diana appeared in person and through an attorney of record, required that both Diana and Andrade undergo a psychological evaluation as soon as possible and follow any recommendation resulting from that evaluation regarding ongoing therapy or psychiatric treatment. The order further provides Diana shall have access to L.A. "every other weekend to be supervised by a third party designated by the Dallas County District Court as authorized to supervise parties litigating child custody in Dallas County." Diana was ordered to bear the cost of the supervision and travel to Dallas County for her supervised visits with L.A. The September 12, 2008 order provides that "[a]ll previous orders in this matter remain in place until further Order of the Court." That order was signed by Diana and her attorney, approving the order as to form. Pursuant to the September 12, 2008 order, Andrade testified he took L.A. to a supervised visitation facility in Dallas County for visits with Diana, and personnel at the facility supervised those visits.

Andrade testified that on Monday morning, December 13, 2010, he was preparing to drive L.A., who was turning seven years of age that week, to elementary school. L.A. was in the back seat behind the driver's seat of Andrade's two-door automobile. Andrade saw Jose and Victor running toward him, and he was afraid. Andrade tried to get into his automobile, but Victor grabbed Andrade by the neck and hit him in the head, causing Andrade to gasp for air. Diana had gotten out of a van parked across the street, and Diana and Jose approached the passenger door of Andrade's automobile. Diana took L.A. out of Andrade's automobile and handed her to Jose. L.A. was crying and yelling as a result of these events. Jose took L.A. to the

van parked across the street. Andrade believed he saw S.J. during this incident, but S.J. did not get out of the van. Andrade did not see Kimberly that morning. Diana, Jose, and Victor threatened Andrade that if he looked for L.A., it was "was going to be bad for him." Jose drove the van away with Diana, Victor and L.A. inside. Andrade testified he did not give Diana or anyone else permission to take L.A. on December 13, 2010.

Andrade got into his automobile and attempted to follow the van. While following the van, he telephoned the Garland Police Department to inform them of the assault and abduction. As he was attempting to catch up with the van, Andrade collided with another automobile. A Garland police officer met Andrade at the scene of the motor vehicle accident.

Andrade related to Garland police the events that had transpired and the police required Andrade to establish he had legal custody of L.A. After five days of not knowing L.A.'s whereabouts following the abduction, a detective contacted Andrade and advised him L.A. had been found in San Antonio. Andrade then traveled to San Antonio, retrieved L.A. from a San Antonio police station, and returned with L.A. to Garland.

### Appellant Diana Peinado

Diana testified that in December 2010, she lived in Laredo with her husband, Jose, and four of her five children: sixteen year old Victor; thirteen year old Kimberly; eleven year old S.J., and three year old D.P. Although Diana indicated she was unaware of their actions at the time they were taken, Jose, Victor, Kimberly, and S.J. travelled to Garland on December 13, 2010 to pick up L.A. Diana saw L.A. at a Laredo police station after Jose and her older children had returned from Garland, and she thought L.A. was there as part of her court-ordered visitation with L.A. According to Diana, on December 14 or 15, 2010, she took L.A. to the district attorney's office in Laredo, although she did not testify as to the reason for doing so. Diana spent time with L.A. after she was brought to Laredo, including taking L.A. to Toys-R-Us, Wal-

Mart, and McDonald's on December 15, 2010, L.A.'s seventh birthday. Diana was arrested on December 16, 2010. Carmen Martinez, with whom L.A. was found in a motel room in San Antonio on December 17, 2010, was Diana's best friend.

Diana testified that in November 2010, she received a telephone call from the Texas Attorney General's Office or "spoke to a representative of Child Support" and had correspondence from the Attorney General's Office that led her to believe she was entitled to custodial possession of L.A. In 2010, Diana was not receiving child support payments from Andrade, but testified Andrade owed past due child support payments.

Diana had been involved since 2005 with family court matters regarding her divorce from Andrade and custody of L.A. She noted the divorce decree was signed by a Bexar County, Texas court on January 13, 2005. Diana acknowledged she had been punished by a court for violating a family court order in 2006. When questioned regarding the July 14, 2008 hearing and order revoking the suspension of Diana's commitment, she denied being present for the hearing, despite the order stating she appeared in person, waived the right to counsel, and announced ready for trial. She also denied that the July 14, 2008 order for her six month jail confinement related to taking L.A. from Andrade in violation of a family court order. According to Diana, she had already been punished for her violations of a family court order, consisting of failure to present L.A. for court-ordered visitations with Andrade, as referenced in the July 14, 2008 order. Diana acknowledged her signature on the September 12, 2008 order of the 131st Judicial District Court, which allowed her supervised visitation with L.A. every other weekend in Dallas County and provides that all previous orders in the family court case remain in place until further order of the court.

Diana testified the family court case involving L.A. was transferred from Bexar County to Dallas County sometime in November 2010. According to Diana, on November 13, 2010, she

contacted a Laredo police officer because she was worried about L.A. Diana advised the Laredo police that the 131st Judicial District Court of Bexar County had jurisdiction over Diana and L.A., and, as a result, the Laredo police department took no action on her concern. Because she continued to be worried about L.A., on November 29, 2010, two weeks before L.A. was taken from Garland to Laredo, Diana appeared at the Garland Police Department, showed a detective a copy of the January 2005 divorce decree, and claimed to have legal custody of L.A. Diana acknowledged that the document she showed the Garland detective on November 29, 2010 had been altered.

### Kimberly Jimenez

Kimberly, seventeen years of age at the time of trial, testified that on December 13, 2010, she was thirteen years of age and in middle school, Victor was in high school, S.J. was in sixth grade, and D.P. was three or four years old. According to Kimberly, on December 13, 2010, she was with Jose, Victor, and S.J. when they travelled to Andrade's home in Garland. Her mother, Diana, was not with them in Garland on that day, but was in Laredo with D.P. Kimberly testified Diana did not know that Jose and the older children were travelling to Garland to get L.A. Jose drove seven hours from Laredo to Garland the night of December 12, 2010, arriving in Garland on the morning of December 13, 2010. According to Kimberly, Diana did not tell them where Andrade lived; rather, Victor knew where Andrade was living from reviewing court papers.

Jose parked the van he was driving in front of Andrade's home. Andrade was standing in the driveway, and L.A. was in Andrade's automobile. Kimberly and Jose stayed in the van; Victor and S.J. got out of the van and approached Andrade. When L.A. saw S.J., she willingly exited Andrade's automobile to be with S.J. Kimberly did not see anything "go on between" Victor and Andrade. L.A. got into the van and sat in the rear seat next to Kimberly. They then drove back to Laredo, stopping only at a fast food restaurant to get L.A. something to eat.

Kimberly testified they arrived in Laredo that night, and Jose, Victor, Kimberly, S.J., and L.A. went to a Laredo Police Station.

Kimberly testified that when they returned to Laredo, Diana appeared to be both happy and "mad" that Jose and the older children had gone to Garland to get L.A. That week, Diana spent time with L.A. in Laredo. On December 15, 2010, L.A.'s birthday, they took her to Peter Piper Pizza. Later that week, on December 17, 2010, Kimberly was in a San Antonio motel room with L.A., S.J., and D.P., when the police arrived and took L.A. from them.

### Victor Jimenez

Victor testified that on December 13, 2010, he was sixteen years of age. He, Kimberly, S.J. and Jose left Laredo at midnight in Jose's van and arrived at Andrade's home in Garland the morning of December 13, 2010. Victor had found Andrade's home address from Diana's "paperwork." Jose parked his van in front of Andrade's home. Andrade came out of his home and started his automobile to warm it up. About ten minutes later, Andrade exited his home with L.A. Victor and S.J., eleven years of age at the time, approached Andrade. L.A. wanted to greet S.J., but Andrade objected, pushed S.J. out of the way, and S.J. fell. Victor stepped in to protect S.J. Andrade was very angry and pushed Victor. Victor pushed Andrade back and then placed his hand around Andrade's neck in a "chokehold" to pull him away from the automobile. L.A. began to scream and cry because Victor was attacking Andrade. S.J. and L.A. walked to Jose's van, and L.A. got into the van willingly. Andrade did not want Victor to take L.A. away. Victor told Andrade, "Okay. This is set. We're done." Victor returned to the van. L.A. looked happy to see Victor. Victor drove six or seven hours back to Laredo, stopping only for fast food and gasoline.

Initially, Victor testified that Jose did not believe it was okay to take L.A. "He wasn't okay with it. But it just happened. We didn't expect it." However, Victor later testified that

Jose felt it was okay for L.A. to be with them. According to Victor, it was nighttime when they arrived in Laredo. They went "straight" to a Laredo Police Station to let them know they had L.A. and to "make sure I didn't do nothing wrong." Victor recalled Laredo police investigators advising Jose they would involve Child Protective Services in the matter because Victor, Kimberly, S.J., and L.A. were minor children.

Shortly after the December 13, 2010 incident, Diana and her family moved out of their house in Laredo. On L.A.'s seventh birthday, December 15, 2010, Victor spent a few hours with her. Victor indicated he did not know how L.A. ended up at a motel in San Antonio with Victor's sisters, because he was in jail at the time, having been arrested in Laredo on December 16, 2010 for "trouble" he had gotten into in October 2010. Victor admitted that prior to Diana's trial, he was incarcerated in the Dallas County jail for a felony cocaine possession conviction. Victor testified he loves his mother and would do anything for her.

### Officer Michael Birdwell

Michael Birdwell, a patrol officer of Garland Police Department, testified that, while responding to a disturbance call on the morning of December 13, 2010, he was dispatched to the scene of a motor vehicle accident involving Andrade. Upon arriving at the scene, Birdwell saw that Andrade was upset and that his face was swollen and had red marks. Andrade informed Birdwell that his daughter, L.A., had been taken by Diana and two men. Andrade told Birdwell that he placed L.A. in his car and had then seated himself in the driver's seat when he observed two males running toward him. Andrade said he had been punched by the men. Birdwell contacted Patrol Lieutenant Martin. Martin came to the scene of the motor vehicle accident; he then conferred with a lieutenant in the Criminal Investigation Division. Following that conversation, Martin instructed Birdwell to prepare an interference-with-child-custody report.

–10–

Thus, in addition to preparing a motor vehicle accident report, Birdwell prepared an incident report concerning interference with child custody.

Officer Danielle May

Danielle May, employed in the Crimes Against Persons Unit of the Garland Police Department in December 2010, testified that on December 14, 2010, she was assigned an interference-with-child-custody case involving L.A., who had not been located since the incident on the morning of December 13, 2010. May contacted Andrade, who described being assaulted during the December 13, 2010 incident. After speaking with Andrade, May verified Andrade's custodial rights by contacting the Bexar County family courts. May then obtained an arrest warrant for Diana. Relying on a prior address for Diana in Laredo, May contacted the Laredo Police Department for assistance in locating L.A. and Diana. May also contacted the San Antonio Police Department for assistance because Diana's and Jose's driver's licenses and vehicle registration had been issued in San Antonio. Because Jose had been identified by Andrade as a participant in the December 13, 2010 incident, May also obtained an "at large" warrant for Jose's arrest. L.A. was found in San Antonio, and Diana was found in Laredo.

Detective Kevin Landrum

Detective Kevin Landrum of the San Antonio Police Department testified that on December 17, 2010, he was assigned to investigate the case and locate L.A. Another San Antonio Police Department officer received information from an unknown source that L.A. could be located at a San Antonio motel. Landrum pursued this lead and found L.A. in a room in that motel. Also present in the motel room were Kimberly, a teenager; S.J., a pre-teen; D.P., a toddler; and Carmen Martinez, an adult. L.A. was transported to the Youth Services Division of the San Antonio Police Department and was then released to Child Protective Services.

*Jury Verdict*

The jury found Diana guilty of interference with child custody, as charged, for which it assessed punishment of two-years' confinement. The jury did not find Diana guilty of the charged offense of aggravated kidnapping, but found her guilty of the lesser-included offense of kidnapping, for which it assessed punishment of six years' confinement. *See* TEX. PENAL CODE ANN. § 20.03(a) (West 2011). Diana appealed those convictions.

## Sufficiency of the Evidence

In her third and fourth points of error, respectively, Diana argues the evidence is insufficient to support her convictions for kidnapping and interference with child custody, either as the primary actor or as a party participant.[2]

*Standard of Review*

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443

---

[2] With regard to law of parties, the jury was instructed in both the kidnapping and the interference-with-child-custody cases as follows:

All persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

A person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, aids, or attempts to aid the other person to commit the offense.

Each party to an offense may be charged with the commission of the offense. Mere presence alone at the time and the place of the commission of an offense, or knowledge of an offense, if any was committed, does not constitute one criminally responsible as a party to the offense.

*See also* TEX. PENAL CODE ANN. § 7.01(a) (West 2011) & 7.02(a) (West 2011).

–12–

U.S. at 319; *see also Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). The factfinder is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) ("The factfinder exclusively determines the weight and credibility of the evidence.").

We defer to the factfinder's determinations of credibility, and may not substitute our judgment for that of the factfinder. *See Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis, appellate court may not re-weigh the evidence and substitute its judgment for that of the factfinder). When there is conflicting evidence, we must presume the factfinder resolved the conflict in favor of the verdict, and defer to that resolution. *Jackson*, 443 U.S. at 326; *see also Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Wise*, 364 S.W.3d at 903.

In our sufficiency review, "direct evidence of the elements of the offense is not required." *Hooper v. State*, 214 S.W.3d 9, 14–15 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and the factfinder is permitted to make reasonable inferences from the evidence presented at trial. *Id.* at 14. "Circumstantial evidence alone can be sufficient to establish guilt." *Id.* at 15. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (quoting *Hooper*, 214 S.W.3d at 13).

*Kidnapping*

A person commits the offense of kidnapping if that person intentionally or knowingly abducts another person. TEX. PENAL CODE ANN. § 20.03(a). The term "abduct" means to restrain a person with the intent to prevent liberation by either (1) secreting or holding the person in a place where the person is unlikely to be found, or (2) using or threatening to use deadly force. *See id*. § 20.01(2). To "restrain" means "to restrict a person's movements without consent, so as to interfere substantially with the person's liberty, by moving the person from one place to another or by confining the person." *Id*. § 20.01(1). Restraint is "without consent" if it is accomplished by force, intimidation, or deception, or by any means, including acquiescence of the victim, if "the victim is a child who is less than 14 years of age or an incompetent person and the parent, guardian, or person or institution acting in loco parentis has not acquiesced in the movement or confinement." *Id*. § 20.01(1)(B)(i).

A kidnapping becomes a completed offense when "a restraint is accomplished, and there is evidence that the actor intended to prevent liberation and that he intended to do so by either secretion or the use or threatened use of deadly force." *Mason v. State*, 905 S.W.2d 570, 575 (Tex. Crim. App. 1995) (internal citation omitted). Here, the State had the burden of proving that a restraint was completed and Diana, as a principal or party participant, evidenced a specific intent to prevent liberation by either secreting or holding L.A. in a place where she was not likely to be found or using or threatening to use deadly force. *Brimage v. State*, 918 S.W.2d 466, 475–76 (Tex. Crim. App. 1994). "Intent can be inferred from the acts, words, and conduct of the accused." *Dues v. State*, 634 S.W.2d 304, 305 (Tex. Crim. App. 1982).

Diana contends the evidence is insufficient to prove she committed the offense of kidnapping L.A., either by her own conduct or as a party participant, or that she had the specific

intent to prevent L.A.'s liberation. The State responds that each element of the completed offense of kidnapping was proven.

The jury heard Andrade's testimony that Diana was present at and assisted in the taking of L.A. from his automobile in Garland on the morning of Monday, December 13, 2010. Specifically, Andrade testified Diana assisted in taking six-year-old L.A. out of Andrade's automobile and handed L.A. to Jose. L.A., who was crying, was taken to Jose's van, whereupon the van with Diana and L.A. in it, was driven away from Andrade's home and to Laredo. Andrade testified he did not give consent for anyone to take L.A. from him on December 13, 2010. The July 14, 2008 order of the 131st Judicial District of Bexar County, awarding Andrade exclusive possession of L.A., was admitted in evidence, as was the September 12, 2008 order from that court, which included Diana's signature as approving the order's form, allowing Diana access for supervised visits with L.A. every other weekend in Dallas County and specifically ordering that all previous orders in the family court case remain in force until further order from the court.

This evidence, and reasonable inferences that can be drawn from the evidence, are sufficient to show that Diana, as a principal or party participant, intentionally or knowingly abducted L.A. on the morning of December 13, 2010, when, without Andrade's consent, six-year-old L.A.'s movements were restrained with the intent to prevent her liberation by secreting or holding her in a place where she was unlikely to be found, namely a van driven away from Andrade's home and to Laredo. *See Sanders v. State*, 605 S.W.2d 612, 614 (Tex. Crim. App. 1980) (automobile being driven on city streets may be used to restrain victim with intent to prevent liberation).[3] Accordingly, we conclude the evidence was sufficient for a rational juror to

---

[3] *See also Wilson v. State*, No. 05-13-00042-CR, 2014 WL 1413568, at *4 (Tex. App.—Dallas Apr. 2, 2014, no pet.) (mem. op., not designated for publication) (an automobile being driven on city streets can be used in "secreting or holding the person in a place where the person is unlikely to be found," as that phase is used in the statutory definition of "abduction").

find Diana guilty of the offense of kidnapping L.A. beyond a reasonable doubt. *Wise*, 364 S.W.3d at 903. We resolve Diana's third point of error against her.

*Interference With Child Custody*

A person commits the offense of interference with child custody if the person takes or retains a child younger than eighteen years of age when the person knows the taking or retention of the child violates the express terms of a judgment or court order disposing of the child's custody. *See* TEX. PENAL CODE ANN. § 25.03(a)(1); *Charlton v. State*, 334 S.W.3d 5, 9 (Tex. App.—Dallas 2008, no pet.). Diana argues the evidence is insufficient to establish the offense of interference with child custody because there is no "reliable" evidence that Diana, as a principal or party participant, intentionally or knowingly took or retained L.A. or that she had knowledge that the taking and retention of L.A. violated the July 14, 2008 court order as alleged in the indictment.[4]

As discussed above, we have concluded the evidence is sufficient to support a finding that Diana, as a principal or party participant, intentionally or knowingly abducted six-year-old L.A. on the morning of Monday, December 13, 2010. The jury heard Andrade's testimony that Diana was present at and assisted in taking L.A. from his automobile. Specifically, Andrade testified Diana assisted in taking six-year-old L.A. out of Andrade's automobile and handing her to Jose. L.A. was then taken to Jose's van, whereupon the van, with Diana and L.A. in it, was driven away from Andrade's home and to Laredo. With regard to whether Diana intentionally or knowingly retained L.A., evidence was admitted indicating that L.A. was with Diana in Laredo during the week of December 13, 2010, before Diana was arrested on December 16, 2010. Although Diana argues there was insufficient "reliable" evidence that Diana intentionally or

---

[4] The indictment alleged that on or about December 13, 2010, in Dallas County, Diana intentionally and knowingly took and retained L.A., a child younger than 18 years, "knowing that the taking and retention violated the express terms of a judgment and order of the 131st District Court of Bexar County, Texas, signed July 14, 2008, disposing of the child's custody."

knowingly took or retained L.A., the jury was entitled to judge the credibility of the witnesses and could choose to believe all, some, or none of the testimony presented by the parties. *See Chambers*, 805 S.W.2d at 461. Viewing the evidence in the light most favorable to the verdict, we conclude a rational juror could find Diana, as a principal or party participant, intentionally or knowingly took L.A. on December 13, 2010 or retained L.A. after she was taken on December 13, 2010. *Wise*, 364 S.W.3d at 903.

Diana further argues there is no "reliable" evidence that Diana had knowledge that taking and retaining L.A. violated the July 14, 2008 order of the 131st Judicial District Court of Bexar County. In contravention of Diana's testimony that she was not present at the July 14, 2008 hearing before the 131st Judicial District Court, the trial court's July 14, 2008 order awarding Andrade exclusive possession of L.A., provides that Diana "appeared in person [at the July 14, 2008 hearing] and, having waived the right to counsel, announced ready for trial." The September 12, 2008 order of the 131st Judicial District Court contains Diana's signature approving the form of the order and provides that Diana is allowed supervised visitation of L.A. in Dallas County every other weekend and specifically orders that all previous orders of the 131st Judicial District Court, which would necessarily include the July 14, 2008 order, remain in force until further order of the 131st Judicial District Court. The jury was entitled to judge the credibility of the witnesses and could choose to believe all, some, or none of the testimony presented by the parties. *See Chambers*, 805 S.W.2d at 461. Viewing the evidence in the light most favorable to the verdict, we conclude a rational juror could find Diana had knowledge that taking and retaining L.A. violated the July 14, 2008 order of the 131st Judicial District Court awarding Andrade exclusive possession of L.A. *Wise*, 364 S.W.3d at 903.

–17–

We conclude the evidence was sufficient for a rational juror to find Diana, as a principal or party participant, guilty of the offense of interference with child custody beyond a reasonable doubt. We resolve Diana's fourth point of error against her.

**Charge Error**

In her first point of error, Diana asserts the trial court erred in refusing to include a mistake-of-fact instruction in the jury charge in both the kidnapping and interference-with-child-custody cases. In her seventh point of error, Diana asserts there is charge error in the kidnapping case because the application paragraph failed to require the jury to find the essential element of intent to prevent liberation and to require a unanimous verdict.

*Standard of Review*

Our first duty in analyzing a jury-charge issue is to decide whether error exists. *Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). If error exists, we then determine whether the error caused sufficient harm to warrant reversal. *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). Properly preserved charge error requires reversal if the error was "calculated to injure the rights of [the] defendant," which means no more than that there must be some harm to the accused from the error." TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006); *see also Abdnor v. State*, 871 S.W.2d 726, 731–32 (Tex. Crim. App. 1994); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). In other words, properly preserved error will call for reversal as long as the error is not harmless. *See Almanza*, 686 S.W.2d at 171. In making this determination, "the actual degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.*; *see also Ovalle v. State*, 13 S.W.3d 774, 786 (Tex. Crim. App. 2000).

When the purported error was not objected to, the error must be "fundamental" and requires reversal only if it was "so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (citing *Almanza*, 686 S.W.2d at 171). Egregious harm exists when the record shows that a defendant has suffered actual, rather than merely theoretical, harm from jury-charge error. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza*, 686 S.W.2d at 174. Egregious harm consists of error affecting the very basis of the case, depriving the defendant of a valuable right, or vitally affecting a defensive theory. *Villarreal*, 453 S.W.3d at 433. "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Id.* (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). As indicated above, we assess harm in light of "(1) the entirety of the jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the trial record as a whole." *Id.* (citing *Almanza*, 686 S.W.2d at 171). "[I]n making our determination, we may presume that the jury acted rationally, at least absent a showing to the contrary." *Alvarado v. State*, 912 S.W.2d 199, 216 (Tex. Crim. App. 1995) (quoting *Richardson v. State*, 879 S.W.2d 874, 882 (Tex. Crim. App. 1993)).

*Mistake of Fact*

A defendant is entitled to an instruction on any defensive issue raised by the evidence, whether the evidence is weak or strong, unimpeached or uncontradicted, and regardless of how the trial court views the credibility of the defense. *Celis v. State*, 416 S.W.3d 419, 429 (Tex. Crim. App. 2013). Section 8.02(a) of the penal code provides that "[i]t is a defense to prosecution that the actor through mistake formed a reasonable belief about a matter of fact if his mistaken belief negated the kind of culpability required for commission of the offense." TEX.

–19–

PENAL CODE ANN. § 8.02(a) (West 2011). The phrase "kind of culpability" in section 8.02(a) means "culpable mental state." *Celis*, 416 S.W.3d at 430 (quoting *Beggs v. State*, 597 S.W.2d 375, 378 (Tex. Crim. App. 1980)). When a defendant raises evidence of a mistaken belief as to the culpable mental state of the offense, a defendant is entitled to an instruction on mistake of fact upon request. *Id.* Therefore, a trial court's refusal to give a charge that applies the law of mistake of fact to the very facts of the case, over the appellant's objection and in the face of a properly requested charge, is reversible error. *Beggs*, 597 S.W.2d at 380. We review the evidence offered to support the defensive issue in the light most favorable to the defense. *Brazelton v. State*, 947 S.W.2d 644, 646 (Tex. App.—Fort Worth 1997, no pet.). If the evidence, viewed in a light favorable to the defense, does not establish the defensive issue, an instruction is not required. *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999); *see also* TEX. PENAL CODE ANN. § 2.03(c) (West 2011) (issue of existence of a defense is not submitted to jury unless evidence is admitted supporting the defense).

Diana requested a mistake-of-fact instruction under section 8.02 of the penal code in the kidnapping and interference-with-child-custody jury charges. The defense argued to the trial court that evidence had been admitted that when Diana saw L.A. at a Laredo police station the night of December 13, 2010, she thought L.A. was there as part of her court-ordered visitation and that Diana testified that in November 2010, she received a telephone call from the Attorney General's Office or "spoke to a representative of Child Support" and had correspondence from the Attorney General's Office that led her to believe she was entitled to custodial possession of L.A.

The elements of the offense of kidnapping the State was required to prove were that Diana, as a principal or a party participant, intentionally or knowingly abducted L.A. With those elements in mind, along with the definitions of "abduct" and "restrain," we determine whether

there was evidence Diana through mistake formed a reasonable belief about a matter of fact that negated Diana intentionally or knowingly abducting L.A. Diana's principal defensive theory was that she was not involved in the abduction of L.A. Diana did not argue at trial that she formed a reasonable belief through mistake of fact that "negated the kind of culpability required" for intentionally or knowingly abducting L.A. Diana categorically denied she participated in the abduction, either as a principal or a party participant. Diana testified she was in Laredo at the time L.A. was placed in Jose's van and driven from Garland to Laredo and she had no knowledge of that event until L.A. was in Laredo that night. Diana's principal defensive theory is therefore inconsistent with an argument that she was entitled to a mistake of fact instruction because she was mistaken in her belief she was entitled to take L.A. from Andrade. But even if we credit Diana with having taken the position at trial that she believed she was entitled to custodial possession of L.A. and therefore could not have formed the culpable mental state necessary for a kidnapping conviction, the defensive theory and associated evidence will not support a mistake of fact instruction. Where the alleged mistaken fact is a matter that is readily discernable by a simple empirical method of investigation that is universally accepted, a mistake of fact defense is not raised by the defendant's failure to properly utilize that method. *King v. State*, 919 S.W.2d 819, 821 – 22 (Tex. App.—El Paso 2996, no pet.); *Miller v. State*, 666 S.W.2d 564, 566 (Tex. App—Houston [14th Dist.] 1984, no pet.). Diana claims she was confused about whether she had custodial possession of L.A. as a result of a telephone conversation with the Attorney General's office or a "representative of Child Support" and documentation received from the Attorney General's office that authorized Andrade's employer to withhold a portion of Andrade's salary for *past* due child support.[5] If Diana was confused about her telephone conversation or the meaning of the Attorney General's correspondence, she could have easily

---

[5] Diana and Andrade initially had joint custody of L.A.

cleared up any confusion by contacting the Office of the Attorney General and making further inquiry. Diana admitted knowing that the 2005 custody decree, along with the 2008 orders, control the parent-child relationship between Diana and L.A. If Diana had any confusion about the custody provisions of the decree and orders, she could have easily cleared up any confusion by contacting the court that issued the decree or orders. The "mistake" alleged here was easily verifiable; accordingly any "belief" that Diana had actual custodial possession of L.A. was not reasonable. *See King*, 919 S.W.2d at 821-22. Finally, the evidence, viewed in a light favorable to the defense, does not establish a mistake of fact, especially in light of Diana's: (1) admission that Andrade had custodial possession of L.A. at the time of trial; (2) failure to show a family court with jurisdiction had made any change in custodial possession since the 2008 orders; and (3) acknowledgement of her signature on the September 12, 2008 order allowing her only supervised visitation with L.A. every other weekend in Dallas County. *Granger*, 3 S.W.3d at 38. We conclude the trial court did not err by failing to include a mistake-of-fact instruction in the kidnapping jury charge.

With regard to the interference-with-child-custody charge, the State was required to prove Diana, as a principal or a party participant, intentionally or knowingly took or retained L.A. on December 13, 2010, knowing that the taking or retention violated the terms of the July 14, 2008 judgment or order of the 131st Judicial District Court of Bexar County. Therefore, in order to be entitled to a mistake-of-fact instruction on the interference-with-child-custody case, there must be evidence that a mistake negated the kind of culpable mental state required for the taking or retaining as charged. The only evidence Diana argued negated the required culpable mental state was her testimony (1) concerning her belief that when she saw L.A. in Laredo the night of December 13, 2010, she was exercising her court-ordered visitation, and (2) that based on a November 2010 telephone call from the Attorney General's Office or "a representative of

Child Support" and correspondence from the Attorney General's Office, she believed she was entitled to custodial possession of L.A.. However, that evidence pertains only to Diana's retention of L.A. Diana did not argue at trial that she formed a reasonable belief through mistake of fact that "negated the kind of culpability required" for intentionally or knowingly taking L.A. As noted previously, Diana's principal defensive theory was that she was not involved in the taking of L.A. Diana categorically denied participation as a principal or a party participant in the taking of L.A. from Garland and driving L.A. to Laredo on December 13, 2010. Diana's principal defensive theory is therefore inconsistent with an argument that she was entitled to a mistake of fact instruction because she was mistaken in her belief she was entitled to take L.A. from Andrade. But even if we credit Diana with having taken the position at trial that she believed she was entitled to custodial possession of L.A. and therefore could not have formed the culpable mental state necessary for taking L.A. knowing that her action violated a court order disposing of the child's custody, the defensive theory and associated evidence will not support a mistake of fact instruction. Nor will the evidence support a mistake of fact instruction on the theory Diana believed she was entitled to custodial possession of L.A. and therefore could not have formed the culpable mental state for retaining L.A. knowing that her action violated a court order disposing of the child's custody. The evidence will not support a mistake of fact instruction for the reasons discussed above in connection with the jury charge in the kidnapping case; namely, the alleged "mistake" was easily verifiable; accordingly any "belief" that Diana had actual custodial possession of L.A. was not reasonable, *King*, 919 S.W.2d at 821-22, and the evidence, viewed in a light favorable to the defense, does not establish a mistake of fact, especially in light of Diana's: (1) admission that Andrade had custodial possession of L.A. at the time of trial; (2) failure to show a family court with jurisdiction had made any change in custodial possession since the 2008 orders; and (3) acknowledgement of her signature on the

–23–

September 12, 2008 order allowing her only supervised visitation with L.A. every other weekend in Dallas County. *Granger*, 3 S.W.3d at 38. Accordingly, we conclude the trial court did not err by failing to include a mistake-of-fact instruction in the interference-with-child-custody jury charge.

We conclude the trial court did not err in refusing to submit Diana's requested instruction of mistake-of-fact in the kidnapping and interference-with-child-custody cases. Accordingly, we resolve Diana's first point of error against her.

*Kidnapping Jury Charge*

Diana contends the jury charge in the kidnapping case was erroneous in failing to include language requiring the jury to find that Diana had intent to prevent the liberation of L.A. Diana contends the *mens rea* element of "intent to prevent liberation" must be set out in the application paragraph of the jury charge, otherwise the jury was allowed to find Diana guilty by only finding she restrained L.A. without the specific intent to prevent liberation. The State responds there was no error because the statutory *mens rea* language concerning intent to prevent liberation about which Diana complains on appeal was included in the definition of "abduct" in the abstract portion of the jury charge.

The abstract portion of the jury charge provided that "a person commits the offense of kidnapping if the person intentionally or knowingly abducts another person." It contains the definitions of "abduct," meaning "to restrain a person with intent to prevent his liberation by secreting or holding the person in a place where he is not likely to be found," and "restrain," meaning "to restrict a person's movements without consent, so as to interfere substantially with his liberty, by moving him from one place to another or by confining him."

–24–

The application portion of the jury charge specifically provides that the terms "abduct" and "restrain" are "defined [in the abstract portion of the jury charge] and ha[ve] the same meaning[s] here." The application paragraph of the jury charge then provides:

> Now, bearing in mind the foregoing instructions, if you find from the evidence beyond a reasonable doubt that on or about the 13th day of December, A.D., 2010, in Dallas County, Texas, the defendant, [Diana], either acting alone or as a party, by soliciting, encouraging, directing, aiding or attempting to aid another, did unlawfully, intentionally or knowingly, abduct L.A., hereinafter called complainant, in that defendant restrained the complainant by confining complainant or by moving complainant from one place to another, and by secreting or holding complainant in a place where complainant was not likely to be found or by threatening to use deadly force, then you will find the defendant guilty of the lesser-included offense of kidnapping, as included in the indictment, and you will make no finding in your verdict as to punishment.

The function of the jury charge is to instruct the jury on the law applicable to the case. *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995); *Caldwell v. State*, 971 S.W.2d 663, 666 (Tex. App.—Dallas 1998, pet. ref'd). "When we review a charge for alleged error, we must examine the charge as a whole, considering the workable relationship between the abstract parts of the charge and those parts that apply the abstract law to the facts of the case." *Caldwell*, 971 S.W.2d at 666. "The abstract or definitional paragraphs serve as a kind of glossary to help the jury understand the meaning of concepts and terms used in the application paragraphs of the charge." *Id*. "Thus, a charge is adequate if it contains an application paragraph that authorizes a conviction under conditions specified by other paragraphs of the jury charge to which the application paragraph necessarily and unambiguously refers, or contains some logically consistent combination of such paragraphs." *Id*.; *see also Vasquez v. State*, 389 S.W.3d 361, 367 (Tex. Crim. App. 2012) (no error in failing to cut and paste the abstract definition of the law of parties into the application paragraph).[6]

---

[6] *Fountain v. State*, Nos. 05-11-00753-CR & 05-11-00797-CR, 2013 WL 1245725, at *3 (Tex. App.—Dallas Feb. 12, 2013, pet. ref'd) (not designated for publication) (application paragraph tracked penal code and referred "necessarily and unambiguously" to definition of offense found in abstract portion of the charge) (quoting *Caldwell*, 971 S.W.2d at 666).

We presume the jury followed the instructions in the application paragraph of the charge, and Diana has not shown otherwise. *See Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996) ("[W]e assume that the jury would follow the instruction as given, and we will not reverse in the absence of evidence that the jury was actually confused by the charge."). Here, the application paragraph incorporated the definition of "abduct," which specifically includes the statutory language relating to restraint of a person "with intent to prevent his liberation." We conclude the jury charge did not erroneously fail to include language requiring the jury to find that Diana had intent to prevent the liberation of L.A.

Diana also argues that the kidnapping jury charge was defective because the application paragraph "combined all the different means and methods of restraint and abduction together but failed to require the jury to find 'intent to prevent liberation' as required for kidnapping," and she was therefore denied a unanimous jury verdict on "this critical element of the offense." Specifically, Diana's concern is that the jury could have found her guilty of "only restraint without finding the essential element that [she] intended to prevent liberation of [L.A.]" since the charge "just combined all the manner and means of restraint along with the manner and means of abduct without requiring a separate finding [of] the mens rea for abduct as opposed to the actus reas for restraint." The State responds that Diana was not denied a unanimous verdict because only one offense was charged and Diana was convicted of only one offense.

Diana acknowledges that an indictment may allege different manners or means of committing a single offense, and jurors are not required to agree upon a single manner or means. *See Landrian v. State*, 268 S.W.3d 532, 536 (Tex. Crim. App. 2008) (jury must agree defendant committed one specific crime, but that does not mean jury must unanimously find defendant committed that crime in one specific way or even with one specific act); *Martinez v. State*, 129 S.W.3d 101, 106 (Tex. Crim. App. 2004) (holding that when the capital murder charge

–26–

authorizes the jury to convict on more than one theory, a guilty verdict will be upheld if the evidence is sufficient on any one of the theories).  As discussed above, the definitions of the terms "abduct" and "restrain" were incorporated in the application portion of the jury charge, and the application paragraph thus required that in order to convict, the jury must find Diana intended to prevent L.A.'s liberation.  The application paragraph further required that the jury find the manner and means of the restraint, from the alternative manner and means included in the jury charge of (1) confining L.A. or (2) moving L.A. from one place to another.  *See Laster v. State*, 275 S.W.3d 512, 521 (Tex. Crim. App. 2009) ("abduct" includes two elements: defendant must have restrained another, which is the *actus reus* requirement; second, defendant must have had specific intent to prevent liberation, which is *mens rea* requirement); *see also Brimage*, 918 S.W.2d at 475 (kidnapping becomes completed offense when a restraint is accomplished, and there is evidence the actor intended to prevent liberation and to do so by either secretion or use or threatened use of deadly force).  The offense of kidnapping requires proof that the defendant intentionally or knowingly abducted another person.  TEX. PENAL CODE ANN. § 20.03(a).  Proof that an abduction has occurred requires evidence of a restraint with "intent to prevent liberation" by secreting or holding a person in a place she is not likely to be found or by using or threatening use of deadly force. TEX. PENAL CODE ANN. § 20.01(2). The manner and means of "restraint" include restriction of movement without consent by moving a person from one place to another or confining the person.  TEX. PENAL CODE ANN. § 20.01(1).  In this case, the jury charge contained a definition of "abduct" that controlled interpretation of that term as it is used throughout the charge, including the application paragraph.  Because the *mens rea* element of the definition ("intent to prevent liberation") applied to all manner and means of restraint identified in the charge (the actus reas), the jury charge cannot be said to deny Diana a unanimous jury verdict.

We conclude the jury charge in the kidnapping case did not erroneously fail to include language requiring the jury to find Diana had intent to prevent the liberation of L.A. and did not deny Diana a unanimous jury verdict. We resolve Diana's seventh point of error against her.

## Evidence of Extraneous Offenses

In her second point of error, Diana argues the trial court erred in the kidnapping and interference-with-child-custody cases by overruling her objection to admission of evidence regarding her prior violations of court orders and the contempt actions against her and that admission of that evidence during the guilt-innocence phase of trial violated rules of evidence 404(b) and 403. The State responds that the trial court did not abuse its discretion in admitting this evidence and Diana opened the door to the evidence during cross-examination of Andrade.

### Standard of Review

We review a trial court's admission or exclusion of evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010); *De La Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009) (admissibility of extraneous offense). We will not reverse the trial court's ruling unless it falls outside the "zone of reasonable disagreement." *De La Paz*, 279 S.W.3d at 343–44; *see also Manning v. State*, 114 S.W.3d 922, 926 (Tex. Crim. App. 2003) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)); *see also Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000) (absent a clear abuse of discretion, trial court's decision to admit or exclude testimony will not be disturbed). A trial court's decision to admit evidence of an extraneous offense is generally within the zone of reasonable disagreement if the evidence shows (1) the extraneous offense is relevant to a material, non-propensity issue, and (2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. *De La Paz*, 279 S.W.3d at 344.

*Discussion*

The trial court granted Diana's motion in limine that the State not refer to "any trouble, problems or arrests that [Diana] has experienced, or any cases now pending against [Diana] . . . unless said subjects are first opened by the defense, for the reason that same would not be admissible in evidence and would be prejudicial and inflammatory." Before trial, the State filed notice of its intention to introduce evidence of Diana's numerous violations of orders regarding visitation, possession and custody of L.A. The State's notice included: (1) the July 14, 2008 order of the 131st Judicial District Court which documented violations by Diana on December 4 and 17, 2005 of court ordered visitation by failing to present L.A. for Andrade's visitation, resulting in a contempt finding against Diana; and (2) Diana's violation of the 131st Judicial District Court's order suspending commitment for contempt by forcefully taking L.A. on June 29, 2008 from Andrade while Andrade was exercising his summer period of possession of L.A. However, at a pretrial hearing, the State informed the court that the State "intend[ed] to prosecute [Diana] for these two Indictments and not to go far ahead afield with that. I mean, we're not going to get into whether or not [Diana violated] court orders in the past, unless the door is opened." In the July 14, 2008 order as originally entered into evidence by the State, Diana's extraneous offenses of violating orders regarding possession and custody visitation, possession and custody of L.A. were redacted.

During cross-examination of Andrade by Diana's counsel, Andrade was asked whether "over the course of the last decade, you guys – there has been some back and forth on following the rules" regarding exercising possession of L.A. Andrade was asked by defense counsel whether in the weeks before the incident at issue, "there had been complaints, one way or the other, about interfering with each other's custody." Outside the presence of the jury, the State argued defense counsel's questioning regarding complaints of interference with custody of L.A.

opened the door to the State being allowed by the trial court to introduce evidence regarding Diana's violations of orders of the 131st Judicial District Court in the family case, and the State moved for admission of an unredacted copy of the July 14, 2008 order. The prosecutor advised the trial court that, in accordance with the trial court's limine order, she instructed Andrade that he was not to testify regarding Diana's violations of child custody orders. Defense counsel's questioning touched on issues implicating those violations of child custody orders. The State argued that by virtue of the defense opening the door regarding "interfering with each other's custody," it should be able to question Andrade about whether he or Diana had ever violated orders regarding child custody issues. In response, defense counsel acknowledged she "could see how the question and answer [regarding 'following the rules'] gives rise to a concern or gives rise to a conversation about complaining about the ruling," but that the follow-up question regarding "complaints" about interference with custody of L.A. was not tantamount to opening the door to evidence regarding violations of orders of the 131st Judicial District Court as contained in the July 14, 2008 order. Defense counsel argued that prejudice from admission of such evidence regarding Diana's violations of orders would outweigh the probative value of the evidence under rule of evidence 403. The trial court granted the State's request to admit into evidence an unredacted copy of the July 14, 2008 order, and to ask questions regarding violations of child custody orders. Diana was granted a running objection to that evidence.

Diana contends that, even if the evidence was relevant, it should have been excluded under rule of evidence 403 because its probative value was substantially outweighed by the danger of unfair prejudice. TEX. R. EVID. 403. Rule of evidence 403 "favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial." *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002). "Unfair prejudice" does not arise from the mere fact that the evidence injures a party's case, because virtually all

evidence that a party offers will be prejudicial to the opponent's case. *Casey v. State*, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007). Evidence is "unfairly prejudicial" only when it tends to have some adverse effect on a defendant beyond tending to prove the fact or issue that justifies its admission. *Id*. When the admissibility of evidence is challenged under rule of evidence 403, a trial court must perform a balancing test to determine if the probative value of the evidence is substantially outweighed by its prejudicial effect. TEX. R. EVID. 403. In conducting a rule 403 analysis, a trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006) (identifying six factors to be balanced under rule 403 but recognizing "these factors may well blend together in practice").

The first two *Gigliobianco* factors involve the probative value of the evidence—how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation coupled with the proponent's need for that item of evidence. *Id.* at 641. With regard to these factors, we note the inherent probative force of the extraneous offense evidence was substantial. The extraneous offense evidence was highly probative of Diana's intent to take L.A. from Andrade on December 13, 2010, and retain L.A. in Laredo, in contravention of the orders of the 131st Judicial District Court regarding possession, custody, and visitation, a material issue at trial. The evidence was also probative of Diana's knowledge of the parameters of her lawful

possession, custody, and visitation with L.A. under those orders, and the absence of mistake in taking and retaining L.A. in contravention of those orders.

Further, defense counsel opened the door to admission of evidence of Diana's violations of court orders regarding possession, custody and visitation. "[A] party who 'opens the door' to otherwise inadmissible evidence risks the adverse effect of having that evidence admitted." *Bowley v. State*, 310 S.W.3d 431, 435 (Tex. Crim. App. 2010). Specifically, Diana opened the door regarding whether there had been "back and forth" between Andrade and Diana "over the course of the last decade" regarding possession of L.A. and whether in the weeks before the incident at issue, there had been complaints "one way or the other, about interfering with each other's custody." The State needed the extraneous offense evidence for purposes of eliminating jury confusion regarding provisions of family court orders relating to possession, custody, and visitation of L.A. and whether Andrade or Diana had interfered with those orders or was interfering with those orders on December 13, 2010, or in the following days. Therefore, these factors weigh in favor of admission of the evidence.

As for the third factor, there is nothing in the record to indicate admission of the evidence would be so inherently inflammatory that it would tend to elicit an emotional response and impress a jury in some "irrational yet indelible way," *Wheeler v. State*, 67 S.W.3d 879, 889 (Tex. Crim. App. 2002), or "lure the factfinder into declaring guilt on a ground different from proof specific to the offense[s] charged" of interference with child custody and kidnapping. *See Old Chief v. United States*, 519 U.S. 172, 180 (1997). As such, this factor weighs in favor of admission of the evidence.

The fourth and sixth factors concern the tendency of the evidence to confuse or distract the jury from the main issues and the amount of time consumed by the presentation of the evidence. *See Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997) (this factor looks

to the "time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense[s]") (citing *Montgomery*, 810 S.W.2d at 389–90). We have already concluded the evidence was highly probative of Diana's intent to take L.A. from Andrade on December 13, 2010, and retain L.A. in Laredo, in contravention of the orders of the 131st Judicial District Court; Diana's knowledge of the parameters of her lawful possession, custody, and visitation with LA. under those orders; and the absence of mistake in taking and retaining L.A. in contravention of those orders. In light of the highly probative nature of the evidence, there is a low probability the evidence would confuse or distract the jury from the main issues in the case. Further, the State needed little time to develop the testimony and for introduction of the unredacted July 14, 2008 order. Of the testimony elicited in its case-in-chief, the State's questioning of Andrade following admission of the evidence consisted of less than four pages of transcription in the record, and a substantial portion of those pages contains testimony unrelated to the evidentiary matter at issue here. These factors weigh in favor of admission of the evidence.

The fifth factor concerns "a tendency of an item of evidence to be given undue weigh by the jury on other than emotional grounds. For example, 'scientific' evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence." *Gigliobianco*, 210 S.W.3d at 641 (internal citation omitted). The evidence at issue here was not prone to this tendency, as it pertained to matters that could easily be understood by a jury. Hence, this factor weighs in favor of admission of the evidence.

The rule 403 factors weigh in favor of admission of the evidence concerning Diana's violation of child custody orders. *Id*. at 641–42. Therefore, we cannot conclude the trial court abused its discretion by determining the probative value of the evidence was not substantially

outweighed by any risk of unfair prejudice in admitting the evidence. *De La Paz*, 279 S.W.3d at 343–44.

Further, Diana failed to preserve a rule of evidence 404(b) objection. At the hearing outside the presence of the jury, the defense argued with regard to whether Diana had opened the door to evidence regarding violations of orders regarding child custody and that introduction of such evidence would be more prejudicial than probative under rule of evidence 403. The trial court granted Diana a running objection to introduction of this evidence. However, the running objection was based on Diana's objection under rule of evidence 403. Generally, to preserve error for appellate review, a party's objection must be sufficiently specific so as to "let the trial judge know what he wants, why he thinks himself entitled to it, and do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it." *Malone v. State*, 405 S.W.3d 917, 925 (Tex. App.—Beaumont 2013, pet. ref'd) (quoting *Resendez v. State*, 306 S.W.3d 308, 313 (Tex. Crim. App. 2009)). We conclude Diana did not specifically make a rule 404(b) objection separate from her 403 objection, and therefore, has not preserved a rule 404(b) complaint on appeal. *See Medina v. State*, 7 S.W.3d 633, 643 (Tex. Crim. App. 1999) (holding appellant's relevancy objection at trial did not preserve error concerning rule 404 extraneous offense claim); *see also Montgomery*, 810 S.W.2d at 388–89 (objecting party did not make separate rule 403 objection from his 404(b) objection, and therefore, had not preserved a rule 403 complaint on appeal).[7]

Even had Diana preserved an appellate complaint under rule 404(b) that the trial court erred in admitting evidence regarding Diana's violations of child custody orders, we disagree this would constitute an abuse of discretion by the trial court. Evidence of other crimes, wrongs, or

---

[7] *See also Washburn v. State*, No. 05-13-00921-CR, 2014 WL 3756486, at *5 (Tex. App.—Dallas July 30, 2014, no pet.) (not designated for publication) (rule 404(b) objection will not preserve a rule 403 complaint; finding no rule 403 objection in record, appellant's complaint of rule 403 objection not preserved for review).

acts is not admissible "to prove the character of a person in order to show action in conformity therewith." TEX. R. EVID. 404(b). But it may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id*. Rule 404(b) is a rule of inclusion, rather than exclusion, and excludes "only that evidence that is offered (or will be used) solely for the purpose of proving bad character and hence conduct in conformity with that bad character." *De La Paz*, 279 S.W.3d at 343. "Whether extraneous offense evidence has relevance apart from character conformity, as required by Rule 404(b), is a question for the trial court." *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). Here, Diana's prior violations of child custody orders are relevant to her intent to take L.A. from Andrade on December 13, 2010, and retain L.A. in Laredo, in contravention of the orders of the 131st Judicial District Court regarding possession, custody, and visitation; Diana's knowledge of the parameters of her lawful possession, custody, and visitation with L.A. under those orders; and the absence of mistake in taking and retaining L.A. in contravention of those orders. The extraneous offense evidence was therefore admissible under rule 404(b).

After reviewing the record, we cannot conclude the probative value of the evidence concerning Diana's violation of child custody orders was substantially outweighed by the danger of unfair prejudice in admitting the evidence. TEX. R. EVID. 403. We conclude Diana failed to preserve a rule of evidence 404(b) objection, but even if she had preserved her appellate complaint, the evidence concerning her violation of child custody orders is admissible under rule 404(b). Accordingly, we conclude the trial court's admission of the complained-of evidence was within the zone of reasonable disagreement and therefore did not constitute an abuse of discretion. *Moses*, 105 S.W.3d at 627. We resolve Diana's second point of error against her.

## Exclusion of Defense Witness Testimony

Diana contends in her fifth point of error that the trial court's exclusion of a defense witness in the punishment phase of trial of the kidnapping and interference-with-child-custody cases was erroneous.

Outside the presence of the jury, the trial court conducted a hearing regarding Diana's intention to call Shirley Poeck to testify in the punishment phase of trial and the State's objection to her testimony. Diana's counsel informed the trial court that she intended to elicit testimony from Poeck, a licensed professional counselor, about statements made by Diana to Poeck in December 2013 for the purpose of medical diagnosis or treatment resulting from an evaluation ordered by the 131st Judicial District Court. Diana's counsel stated Poeck would not provide expert opinion and that Poeck's testimony relating to statements Diana made to her for the purpose of medical diagnosis or treatment was admissible as an exception to the rule against hearsay. TEX. R. EVID. 803(4). According to Diana's counsel, Poeck was to provide testimony that as recently as December 2013, Diana still expressed anxiety and fear concerning the welfare of L.A. Diana's counsel argued that testimony was mitigating evidence relevant to the jury's assessment of punishment. The State objected to testimony from Poeck concerning Diana's listing of her perceived problems with Andrade and issues relating to custody of L.A. on the basis that the statements were not made for the purpose of medical diagnosis or treatment, and thus the testimony did not qualify as an exception to the rule against hearsay.

Poeck's testimony was then tendered by Diana outside the jury's presence. Poeck testified she first met with Diana in December 2013. Diana came to Poeck's office as a patient, and Diana made statements to Poeck to enable Poeck to counsel her and to make an evaluation or otherwise render treatment or a diagnosis. Diana told Poeck about her past and present symptoms, sensations, emotions, and thoughts regarding her lengthy custody battle with

Andrade. Diana expressed ongoing concerns about L.A., with her primary concern being that she wanted to be able to see and visit L.A. Diana made statements concerning L.A.'s safety and welfare; Diana indicated that she was worried, scared, and anxious about L.A. being abused, however she told Poeck that nothing had come of prior investigations of alleged sexual abuse of L.A. Diana stated she felt she had been wronged because L.A. was taken from her by Andrade's lawyer. Diana told Poeck that her feelings of worry, apprehension, and tension caused her to cry easily when she thought about not being able to be with L.A., and Diana described physical symptoms such as the sensation of tightening in her chest, stomach discomfort, and sadness at not being able to visit with L.A. Poeck generated a nine-page report that was tendered to the family court.[8] On cross-examination by the State, Poeck testified she evaluated Diana in order for Diana to demonstrate her competency to a judge and to "open" a child custody case. Poeck testified she saw Diana in three follow-up visits after the initial visit.

Following Poeck's proffered testimony, Diana's counsel argued Poeck's testimony should be admitted in the punishment phase to rebut testimony regarding Diana's failure to comply with orders from the family court addressing child custody matters and to demonstrate Diana attempted to obtain a psychological evaluation as ordered by the family court in order to gain custody of L.A. or to be allowed to visit L.A. The State objected to Poeck's testimony as hearsay because Diana's statements to Poeck were not made in the course of medical diagnosis or treatment. After hearing Poeck's proffered testimony and the arguments of Diana and State, the trial court granted the State's motion to exclude Poeck's testimony.

Section 3(a) of article 37.07 of the code of criminal procedure allows evidence during the punishment phase about "any matter the court deems relevant to sentencing." TEX. CODE CRIM.

---

[8] Poeck's report is not contained in the record on appeal.

PROC. ANN. art. 37.07, § 3(a) (West Supp. 2014).[9] We review a complaint regarding the admission or exclusion of evidence at the punishment phase of trial under an abuse of discretion standard. *Mitchell v. State*, 931 S.W.2d 950, 953 (Tex. Crim. App. 1996) (plurality op.) (citing *Saenz v. State*, 843 S.W.2d 24, 26 (Tex. Crim. App. 1992)); *see also Moreno v. State*, 1 S.W.3d 846, 861 (Tex. App.—Corpus Christi 1999, pet. ref'd) ("The trial court has broad discretion in determining admissibility of evidence at the punishment phase of trial."). "[T]he trial judge must still restrict the admission of evidence to that which is 'relevant to sentencing'—in other words, a trial judge must operate within the bounds of Texas Rules of Evidence 401, 402, and 403." *Ellison v. State*, 201 S.W.3d 714, 722 (Tex. Crim. App. 2006). Questions of relevance should be left largely to the trial court, relying on its owns observations and experience, and will not be reversed absent an abuse of discretion. *Moreno v. State*, 858 S.W.2d 453, 463 (Tex. Crim. App. 1993). "Determining what is relevant then should be a question of what is helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case." *Rogers v. State*, 991 S.W.2d 263, 265 (Tex. Crim. App. 1999).

Under rule of evidence 803(4), the following is not excluded by the rule against hearsay, regardless of whether the defendant is available as a witness:

> A statement that:
> (A) is made for—and is reasonably pertinent to—medical diagnosis or treatment; and
> (B) describes medical history; past or present symptoms or sensations; their inception; or their general cause.

---

[9] Section 3(a) of article 37.07 of the code of criminal procedure provides:

> [E]vidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a).

TEX. R. EVID. 803(4). Here, Poeck's proffered testimony concerned Diana's statements to Poeck made three years after the incident at issue. Diana's statements to Poeck concerned her background and history, battle with Andrade over custody of L.A., and worries about purported abuse of L.A. Those statements were made for the purpose of gaining custody of or visitation with L.A. Poeck's testimony about those statements was hearsay and the testimony was not admissible under the hearsay exception in rule of evidence 803(4) relating to statements made for and reasonably pertinent to medical diagnosis or treatment. TEX. R. EVID. 803(4).

We cannot conclude the trial court abused its discretion in excluding Poeck's testimony. *Moreno*, 858 S.W.2d at 463. Accordingly, we resolve Diana's fifth point of error against her.

### Limitation on Testimony of Defense Witness

Diana argues in her sixth point of error that the trial court's limitation of Anna Kaiser's testimony in the punishment phase of trial of the kidnapping and interference-with-child-custody cases was error. The State responds that Kaiser's excluded testimony was inadmissible hearsay and Diana did not establish an outcry exception for admissibility of the hearsay.

Outside the presence of the jury, defense counsel informed the court of her intention to elicit testimony from Anna Kaiser, a former employee of Hannah's House, an agency supervising Diana's visits with L.A., regarding Kaiser's observations of Diana and L.A. during a December 21, 2008 visit. Defense counsel expressed the intention to elicit testimony from Kaiser regarding L.A. showing Diana on a doll where Andrade purportedly had touched her. Diana argued Kaiser's testimony would not constitute hearsay because it would not be offered for the truth of the matter asserted. Rather, defense counsel indicated Kaiser's testimony would establish Diana's state of mind and the effect L.A.'s statements concerning Andrade's "touching" had on Diana. The State objected to Kaiser testifying as to hearsay statements by L.A. or Diana, and the State asserted L.A.'s out-of-court statement did not qualify as an

–39–

exception to the inadmissibility of hearsay under article 38.072 of the code of criminal procedure.

The trial court limited Kaiser's testimony to what she witnessed, but excluded testimony regarding L.A.'s statements, particularly any purported child outcry statement. Following the trial court's ruling, Kaiser testified she observed and monitored the conversation and interactions between Diana and L.A. during Diana's supervised visitation with L.A. on December 21, 2008, at Hannah's House. Kaiser testified there was loving interaction between L.A. and Diana, and L.A. looked afraid when it was time to leave Diana and wanted to remain with Diana.

Outcry testimony of a child victim is hearsay when it is offered for the truth of the matter asserted. *Dorado v. State*, 843 S.W.2d 37, 38 (Tex. Crim. App. 1992). However, it is admissible if it falls within an exception to the hearsay rule. *Id*. Article 38.072 of the code of criminal procedure allows the admission of a hearsay statement made to an outcry witness by certain abuse victims, including child victims of sexual abuse. TEX. CODE CRIM. PROC. ANN. art. 38.072, § 2(a) (West Supp. 2014);[10] *Lopez v. State*, 343 S.W.3d 137, 140 (Tex. Crim. App. 2011). The outcry witness is the first person over the age of eighteen, other than the defendant,

---

[10] Article 38.072 of the code of criminal procedure, entitled "Hearsay Statement of Certain Abuse Victims," provides in pertinent part:

Sec. 1. This article applies to a proceeding in the prosecution of an offense under any of the following provisions of the Penal Code, if committed against a child younger than 14 years of age or a person with a disability:
(1) Chapter 21 (Sexual Offenses) or 22 (Assaultive Offenses)[.]

* * *

Sec. 2 (a) This article applies only to statements that:
(1) describe:
(A) the alleged offense; or
(B) if the statement is offered during the punishment phase of the proceeding, a crime, wrong, or act other than the alleged offense that is:
(i) described by Section 1;
(ii) allegedly committed by the defendant against the child who is the victim of the offense or another child younger than 14 years of age; and
(iii) otherwise admissible as evidence under Article 38.37, Rule 404 or 405, Texas Rules of Evidence, or another law or rule of evidence of this state;
(2) were made by the child or person with a disability against whom the charged offense or extraneous crime, wrong, or act was allegedly committed; and
(3) were made to the first person, 18 years of age or older, other than the defendant, to whom the child or person with a disability made a statement about the offense or extraneous crime, wrong, or act.

TEX. CODE CRIM. PROC. ANN. art. 38.072.

to whom the child spoke about the offense. *Lopez*, 343 S.W.3d at 140. To qualify as a proper outcry statement, the child must have described the alleged offense in some discernible manner that is event-specific rather than person-specific, and must be "more than words which give a general allusion that something in the area of child abuse is going on." *Id.* (citing *Garcia v. State*, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990)).

Here, Diana proffered no evidence to establish Kaiser was the first person to whom L.A. made an outcry statement such that her testimony could be construed as something other than inadmissible hearsay. The testimony Diana sought to elicit from Kaiser, that L.A. showed to Diana on a doll where Andrade purportedly touched her, was not discernibly an outcry, and Diana's proffered evidence did not establish admissibility of this evidence over the State's hearsay objection.[11] *Lopez*, 343 S.W.3d at 140.

Affording the trial court the broad discretion to which it is entitled in admitting or excluding evidence during the punishment phase of trial, we cannot conclude on this record that the trial court's exclusion of Kaiser's testimony regarding L.A. showing Diana on a doll where Andrade purportedly touched her and the effect it had on Diana falls outside the "zone of reasonable disagreement." *See De La Paz*, 279 S.W.3d at 343–44. Accordingly, we resolve Diana's sixth point of error against her.

---

[11] There were numerous statements by witnesses during the punishment phase of trial regarding allegations of purported sexual abuse of L.A. by Andrade, and there was an allegation of sexual abuse of L.A. by Andrade made by Diana a number of years before the December 21, 2008 supervised visitation about which Diana tendered Kaiser to testify. Lesley Cassidy, a caseworker employed by the Texas Department of Family and Protective Services (Child Protective Services) testified Child Protective Services had conducted multiple investigations of allegations of sexual abuse of L.A. by Andrade. For example, when Diana had custody of L.A. in July 2006, a complaint of physical neglect of L.A. was made against Diana based on L.A. being dirty, losing weight, having long fingernails. Cassidy testified Diana was defensive during the investigation of that complaint and said L.A.'s condition was because Andrade was sexually abusing her. Cassidy testified no allegation of sexual or physical abuse had been found to be true.

## Conclusion

Having resolved Diana's points of error against her, we affirm the trial court's judgments for the convictions of interference with child custody in Cause No. F-10-25782-L and of kidnapping in Cause Number F-12-00406-L.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

140418F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

DIANA FLORES PEINADO, Appellant

No. 05-14-00418-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 5, Dallas County, Texas,
Trial Court Cause No. F-10-25782-L.
Opinion delivered by Justice Fillmore,
Justices Myers and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 18th day of August, 2015.



## Court of Appeals
## Fifth District of Texas at Dallas

# JUDGMENT

DIANA FLORES PEINADO, Appellant

No. 05-14-00419-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court
No. 5, Dallas County, Texas,
Trial Court Cause No. F-12-00406-L.
Opinion delivered by Justice Fillmore,
Justices Myers and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 18th day of August, 2015.